## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| AUDRIE SAFRITHIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-2067 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| DAVID J. SHULKIN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's motion for summary judgment [18]. For the reasons set forth below, the motion [18] is granted in part and denied in part. The case is set for further status on October 9, 2018 at 9:00 a.m.

### I.      Background

On June 30, 2013, Plaintiff Audrie Safrithis was appointed as a Certified Registered Nurse Anesthetist ("CRNA") at the Jesse Brown VA Medical Center in Chicago. [26 (Resp. Def.'s Stmt. of Facts), at ¶ 1.] Plaintiff's position was subject to a two-year probationary period. [*Id.*] While Plaintiff worked at Veterans Affairs (the "VA" or "Defendant"), Dr. Ronald Albrecht was the chief of the anesthesiology unit and he was in charge of the department. [*Id.* at ¶ 2.] CRNAs at the VA were assigned to provide anesthesia services to patients during surgical procedures. [*Id.* at ¶ 3.] CRNAs are required to stay at the patient's bedside during the entire surgical procedure to monitor the patient in case anesthesia care is required and to ensure that the patient wakes comfortably and is able to breathe on his or her own. [*Id.*] CRNAs may not leave a patient's bedside whenever they want a break; rather, they first must find an available anesthesia attending physician, resident,

or CRNA who can take over the procedure. [*Id*.] Besides CRNAs, the anesthesiology department at the VA also included attending physicians and residents. [*Id*. at ¶ 5.] Residents performed essentially the same duties that the CRNAs performed. [*Id*.] Attending physicians supervised the CRNA or resident assigned to each patient. [*Id*.]

In or around February 2014, Plaintiff discovered that she was pregnant. [*Id*. at ¶ 6.] Plaintiff had a high-risk pregnancy due to her age, and her pregnancy was complicated by pregnancy-induced hypertension, of which she informed her first level supervisor at the time, Dr. Syed Raza. [32 (Resp. Pl.'s Stmt. of Facts), at ¶ 1.][1] When Plaintiff asked Dr. Albrecht if she could work offsite less frequently during her pregnancy, Dr. Albrecht denied her request and told her that she should "be able to do everything like everybody else." [*Id*.] Plaintiff went on maternity leave on or about September 15, 2014. [26 (Resp. Def.'s Stmt. of Facts), at ¶ 6.] She gave birth on September 18, 2014, and she returned to work on January 12, 2015. [*Id*. at ¶¶ 6-7.] Before Plaintiff went on maternity leave, she was given "high satisfactory" ratings in all categories of her proficiency report, which was signed by Dr. Albrecht and Dr. Raza, and described her as "very conscientious," "competent," and as giving "number one priority" to her patients. [32 (Resp. Pl.'s Stmt. of Facts), at ¶ 2.]

## A.    Plaintiff's Pumping and the March 24, 2015 Incident

When Plaintiff returned to work, she planned to take breaks to pump breast milk to feed her baby. [*Id*. at ¶ 3.] Plaintiff aimed to pump approximately every two hours. [*Id*.] At the time she returned to work, Plaintiff was able to pump either in the CRNA office or in the locker room downstairs from the anesthesia department. [26 (Resp. Def.'s Stmt. of Facts), at ¶ 8.] Although

---

[1] Defendant admitted that Plaintiff testified to this fact. Because the Court credits Plaintiff's testimony on Defendant's motion for summary judgment, Defendant effectively has admitted this fact and any other facts to which Defendant admits that Plaintiff's testimony supports.

both locations had locked doors, neither location had a sink. [*Id.*] A dedicated lactation room also was available, but it was located in another building on the VA campus. [*Id.*] Plaintiff found that the lactation room was too far from the anesthesia department. [*Id.*] In April of 2015, the VA opened a new lactation room in Plaintiff's building. [*Id.*] Plaintiff was paid for the time she spent pumping breast milk on breaks. [*Id.* at ¶ 9.]

Plaintiff claims that when she returned to work, she was harassed and discriminated against based on her status as a breastfeeding female. On January 12, 2015, Plaintiff's first day back from maternity leave, Plaintiff requested a break to go pump when Dr. Phil Espaldon told her she could go because she had "not done anything all day." [32 (Resp. Pl.'s Stmt. of Facts), at ¶ 5.] CRNA Robert Kloth testified that he believed that Plaintiff's pumping in the afternoon was an inconvenient time for attending anesthesiologists and that some (but not all) of the attendings were frustrated about it. [*Id.* at ¶ 33.] He also testified that there was animosity between Plaintiff and Drs. Angelov and Fox. [*Id.*] Indeed, Plaintiff testified that Dr. Fox would ask Plaintiff how she could be reached while pumping, told Plaintiff to alert the group when she was going to pump, and pounded on the door while Plaintiff was pumping asking Plaintiff what she was doing, what she had been doing, and whether she had to pump at that time. [*Id.* at ¶ 7.][2]

On March 24, 2015, Plaintiff wrote Dr. Albrecht a letter complaining that she believed she was being harassed by Dr. Fox, an attending physician. [26 (Resp. Def.'s Stmt. of Facts), at ¶ 10.] In the letter, Plaintiff complained of an incident that occurred on March 23, 2015. [*Id.* at ¶ 11.] According to the letter, Dr. Fox approached Plaintiff and asked her to give another CRNA a break. [*Id.*] Plaintiff reports that she explained to Dr. Fox that she needed to pump. [*Id.*] When she finished pumping approximately 30 minutes later, the other CRNA no longer needed a break. [*Id.*]

---

[2] Defendant disputes that Dr. Fox was pounding on the door, but that fact is supported by Plaintiff's deposition testimony, which the Court credits for the purposes of this summary judgment motion.

But Plaintiff still felt like Dr. Fox was watching her to see if she would relieve the other CRNA. [*Id*.] In the letter, Plaintiff reported to Dr. Albrecht that she felt she was being singled out and harassed by Dr. Fox and that Dr. Fox should have asked someone else to give the CRNA a break. [*Id*. at ¶ 12.] Plaintiff reported that she believed she was being harassed because she was taking breaks to pump breast milk. [*Id*.] She also reported that she had heard from another staff member that Dr. Fox had told staff members that Plaintiff had been "doing nothing for the past hour." [*Id*.] In response to Plaintiff's letter, Dr. Albrecht met individually with Plaintiff and with Dr. Fox. [*Id*. at ¶ 13.] But Plaintiff testified that nothing happened in response to her complaint.[3] [20-2 (Safrithis Dep.), at 89:2-4.]

### B.     March 30, 2015 Incident

The code-blue pager is a notification device that should alarm if a patient goes into cardiac and/or respiratory arrest anywhere in the hospital. [26 (Resp. Def.'s Stmt. of Facts), at ¶ 19.] When a code blue is announced, one representative from the anesthesiology group would be responsible for immediately responding, along with representatives from each of several other hospital departments. [*Id*.] The representative from the anesthesiology group is responsible for opening the arrested patient's airway. [*Id*.] A code blue is announced over both the code-blue pagers and the overhead intercom system in order to reduce the risk of a technological failure. *Id*. at ¶ 20. The individual responsible for the code-blue pager must immediately respond to a code blue whether it is announced over the pager, over the intercom, or both. [*Id*. at ¶ 21.] When the

---

[3] Defendant objects to Plaintiff's assertion that nothing came of Plaintiff's complaint, citing to an email from Dr. Albrecht attempting to setup a team meeting to "improve communication and bolster department relationships." [20-2 (Def.'s Ex. 12), at 85.] It is not clear from the email that the meeting was being setup to address Plaintiff's complaint. Furthermore, Plaintiff informed Dr. Albrecht that she could only attend the meeting on her day off if she was permitted to bring her child, which she was not. [20-2 (Safrithis Dep.), at 89:5-22.] The meeting was not rescheduled to allow Plaintiff to attend. [32 (Resp. Pl.'s Stmt. of Facts), at ¶ 18.] Thus, even assuming the meeting was setup to address Plaintiff's complaint, a jury could conclude that a meeting excluding Plaintiff was insufficient to address Plaintiff's complaint.

individual responsible for the code-blue pager ends her tour of duty or otherwise cannot perform emergency code-blue duties, she is required to physically hand the code-blue pager to another staff member, so it always is clear who is responsible for responding to a code blue. [*Id*. at ¶ 22.]

On March 30, 2015, Dr. Felix Angelov instructed resident Dr. Alexandra Baracan to give the hospital's code-blue pager to Plaintiff after stating there was an emergency in GI.[4] [32 (Resp. Pl.'s Stmt. of Facts), at ¶ 5.] At some point later, Plaintiff called Dr. Angelov at a technician's instruction, and Dr. Angelov asked Plaintiff to see a patient. [*Id*. at ¶ 12.] While on the phone, Plaintiff heard Dr. Kahn (the doctor performing the operation) saying "we're done, we're done," and Dr. Angelov say they were coming "up," which indicated to Plaintiff that they would be back to the anesthesiology department within five or ten minutes. [*Id*.] After Plaintiff saw a patient for five or ten minutes, she came back to the anesthesiology department and took some notes. [*Id*. at ¶ 13.] At that point, Plaintiff could no longer wait to pump, so she changed her clothes and put the code-blue pager in the anesthesia resident's room. [*Id*. at ¶¶ 13-14.] Plaintiff testified that she ran into Dr. Angelov in the hallway on her way to pump about 30 seconds later and told him where she left the pager and updated him on the status of the patient. [*Id*. at ¶ 14.] Plaintiff also testified that she was not "trying to find" Dr. Angelov because she believed he was coming right back. [*Id*.] Dr. Baracan then ran to the residents' room to get there as fast as possible to pick up the pager. [26 (Resp. Def.'s Stmt. of Facts), at ¶ 28.] Dr. Baracan found the pager completely unattended on the desk. *Id*. Plaintiff finished pumping at approximately 5:00 or 5:30 p.m. [*Id*. at ¶ 30.] Plaintiff says that she went home when she was done pumping because it was the end of her tour of duty. [*Id*.]

_____

[4] The Court infers that "GI" refers to the Gastroenterology Department. However, "GI" is not defined or otherwise identified in Plaintiff's Statement of Additional Facts. Where the emergency was occurring, however, has no bearing on the legal issues before the Court on Defendant's motion for summary judgment.

A day or so later, Plaintiff told Dr. Angelov that she did not know that it was improper to leave the code pager on the resident's desk because she had seen it left there before. [32 (Resp. Pl.'s Stmt. of Facts), at ¶ 15.] Dr. Angelov told Plaintiff that he was not going to write up the incident. [*Id.*] Plaintiff notified Dr. Raza about the incident soon after, and Plaintiff was never responsible for the code-blue pager again. [*Id.*] Prior to March 2015, Plaintiff had never assumed responsibility of the code-blue pager before at any of her places of employment, nor had she ever been involved in a code-blue announcement. [*Id.* at ¶ 24.] During Plaintiff's employment interview, Dr. Albrecht told her "that's what residents are here for," when Plaintiff inquired about the code-blue pager responsibility. [*Id.*] Plaintiff did not receive training on how to use the code-blue pager because when a code blue is announced via the pager (and overhead) the location of the code blue also is announced. [*Id.*]

### C.     May 19, 2015 and June 9, 2015 Incidents

On May 15, 2015, Dr. Albrecht sent an email to the anesthesiology group—including Plaintiff—regarding phones that had been provided to all anesthesiology staff. [26 (Resp. Def.'s Stmt. of Facts), at ¶ 15.] Dr. Albrecht stated that it was his expectation that all attending physicians, CRNAs, and techs would have these phones active and on their person during their tours of duty. [*Id.*] A week or two after the phones were distributed in May 2015, Plaintiff informed Drs. Raza, Angelov, Albrecht and Timothy VadeBoncouer that she would not bring her phone with her while she was pumping because it was a stressor that prevented her from expressing milk. [32 (Resp. Pl.'s Stmt. of Facts), at ¶ 19.]

On May 19, 2015, two physicians attempted to contact Plaintiff on her work phone during her tour of duty, but they were unable to reach her because she was pumping. [26 (Resp. Def.'s Stmt. of Facts), at ¶ 16.] Dr. Albrecht found Plaintiff's phone on the desk in the empty CRNA

office.[5]  [*Id*.]  In an email the next day, Dr. Albrecht instructed Plaintiff to carry her work phone during her tour of duty.  [*Id*.]  After this email, Plaintiff told Dr. Albrecht that she would not carry her phone with her when she went to pump because the interruptions negatively impact her ability to express milk.  [*Id*.]

On June 9, 2015, Plaintiff again did not answer her work phone when an attending physician tried to reach her during her tour of duty because she was not carrying her work phone while she was pumping.  [*Id*. at ¶ 17.]  The attending physician then texted Plaintiff on her personal phone.  [*Id*.]  As a result of this text, Plaintiff had difficulty expressing milk and had to stop pumping.  [32 (Resp. Pl.'s Stmt. of Facts), at ¶ 20.]  Plaintiff claims that she carried her personal phone with her so that she could be cognizant of what time it was in order to be sure she was not away for too long.  [*Id*.]  As a result of this incident, Plaintiff wrote Dr. Albrecht an email indicating that she believed she was being harassed while nursing and that the harassment was causing her stress.  [See 20-2 (Def.'s Ex. 15), at 92-93.]  Dr. Albrecht again instructed Plaintiff by email that she was expected to carry her phone during her tour of duty [26 (Resp. Def.'s Stmt. of Facts), at ¶ 18], but he also instructed Plaintiff that she did not need to answer the phone while she was on an approved break.  [32 (Resp. Pl.'s Stmt. of Facts), at ¶ 19.]  After that email, Plaintiff again told Dr. Albrecht that she would not carry her work phone when she went to pump.  [26 (Resp. Def.'s Stmt. of Facts), at ¶ 18.]

### C.    Summary Review Board

On June 12, 2015, there are at least a couple emails between Dr. Albrecht, Dr. Angelov, and others discussing the March 30, 2015 incident.  [20-2 (Def.'s Exs. 16 and 17), at 94-97.]  On June 15, 2015, Dr. Albrecht requested that a summary review board be convened to review

---

[5] Plaintiff does not admit or deny this assertion.  Because Plaintiff has not identified any contrary evidence or challenged Defendant's evidentiary support, the Court deems the fact admitted.

Plaintiff's conduct. [26 (Resp. Def.'s Stmt. of Facts), at ¶ 32.] Dr. Albrecht reported three incidents of potential misconduct. [*Id.*] First, Dr. Albrecht reported that Plaintiff had repeatedly refused to carry her work phone while she was on break. [*Id.*] Second, Dr. Albrecht reported that on March 30, 2015, Plaintiff had abandoned the code-blue pager in the residents' room and left the anesthesiology department in street clothes prior to the end of her tour of duty.[6] [*Id.*] Third, Dr. Albrecht reported the disagreement between Plaintiff and Dr. Fox regarding whether Plaintiff should be required to take over for another CRNA to give him a break. [*Id.*] Although Dr. Albrecht identified multiple incidents of potential misconduct, he testified that that the issue raised to the Summary Review Board was "limited to this particular episode" regarding the blue code pager, which occurred on March 30, 2015. [32 (Resp. Pl.'s Stmt. of Facts), at ¶ 22.] That same month, after the summary review board was requested, Dr. Angelov told Plaintiff "we just want to get rid of you" and "we don't want you here anymore." [*Id.* at ¶ 23.][7]

On June 16, 2015, Dr. Jeffrey Ryan, the chair of the summary review board, sent Plaintiff a letter informing her of the summary review board and the allegations against her. [26 (Resp. Def.'s Stmt. of Facts), at ¶ 33.] The letter identified four alleged deficiencies in conduct on the part of Plaintiff: (1) the failure to properly hand-off a "code-blue" pager on or about March 30, 2015 ("Charge A"), (2) the failure to follow established leave procedures by leaving before Plaintiff's tour of duty ended on March 30, 2015 and June 2, 2015 ("Charge B"), (3) inappropriate conduct for failing to relieve another employee on March 23, 2015 ("Charge C"), and (4) failure

---

[6] Dr. Albrecht accused Plaintiff of leaving at 3:37 p.m. on June 2, 2015 and leaving at approximately 4:45 on March 30, 2015. [32 (Resp. Pl.'s Stmt. of Facts), at ¶ 27.] Although Plaintiff has identified evidence indicating that she did not leave as early as she was accused of leaving, [*id.*], Plaintiff has not shown that Dr. Albrecht was aware of such evidence. Furthermore, Defendant has cited to reports that Plaintiff did leave before 5:30 p.m. on those days. [See, *e.g.*, 32-2, at 28.]

[7] Defendant disputes this fact. Because Plaintiff's deposition testimony supports the fact, however, the Court accepts it as true for purposes of considering Defendant's summary judgment motion.

to follow instructions by failing to carry her phone at all times in order to promote better communication on May 15, 2015 and June 9, 2015 ("Charge D"). [20-2 (Def.'s Ex. 20), at 125-26.]

The summary review board was made up of Dr. Jeffrey Ryan (chairperson), health systems specialist Mark Weisenberger (secretary), nurse Lenne Robles, and CRNA Andy Tracy. [26 (Resp. Def.'s Stmt. of Facts), at ¶ 34.] Plaintiff did not know any of these individuals before the Summary Review Board. [*Id*.] Plaintiff submitted a written statement regarding her conduct. [*Id*. at ¶ 33.] Dr. Albrecht was brought before the members of the Summary Review Board "to provide any additional information that may not [have been] included in the evidence file." [20-2 (Def.'s Ex. 22), at 147.] At that time, Dr. Albrecht stated that his real concern with Plaintiff's performance was the patient safety issue relating to Charge A, the only charge sustained. [*Id*. at 147, 149.]

The summary review board sustained the allegation that Plaintiff had failed to properly hand off the code-blue pager (Charge A) but found that the remaining charges were not sustained. [*Id*. at 149.] Still, the Summary Review Board believed that Plaintiff's failure to properly hand off the code-blue pager resulted in a risk to the health and safety of patients that was of sufficient gravity to warrant Plaintiff's separation from the VA. [*Id*.] The Summary Review Board members voted unanimously for a separation. [*Id*.] Plaintiff disputes the Summary Review Board's conclusions. [26 (Resp. Def.'s Stmt. of Facts), at ¶ 36.] Dr. Ryan, the chairperson of the summary review board, did not know that Plaintiff had engaged in any protected activity prior to the summary review board hearing. [*Id*. at ¶ 37.] Dr. Ryan denies that the summary review board took any action to discriminate against Plaintiff on the basis of her sex or in retaliation for prior protected activity. [*Id*.]

By letter dated June 25, 2015, Plaintiff was informed of the summary review board's recommendation, and was told that she would be separated from service at the VA as of June 26, 2015. [*Id*. at ¶ 38.] Plaintiff was given the option to resign in lieu of termination, and she resigned her position on June 25, 2015. [*Id*. at ¶ 39.] Plaintiff resigned because she feared that a termination would affect future job prospects. [32 (Resp. Pl.'s Stmt. of Facts), at ¶ 31.] Dr. Albrecht instructed Plaintiff to write "for personal reasons" on her resignation letter. [*Id*.]

## II.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014) (quoting *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008)). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for

purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). With each motion for summary judgment filed pursuant to Rule 56 "the moving party shall serve and file—(1) any affidavits and other materials referred to in Fed. R. Civ. P. 56(e); (2) a supporting memorandum of law; and (3) a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law[.]" LR 56.1 (N.D. Ill.). The statement of material facts "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. Failure to submit such a statement constitutes grounds for denial of the motion." *Id.*

"Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)); see also *Anderson*, 477 U.S. at 250. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp.*, 477 U.S. at 323. In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all

reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

## III. Analysis

### A. Fair Labor Standards Act Claim

Plaintiff claims that Defendant violated Section 207(r) of the Fair Labor Standards Act ("FLSA), 29 U.S.C. § 201 et seq., by interfering with her ability to take breaks in order to express breast milk. Section 207 of the FLSA requires employers to provide "(A) a reasonable break time for an employee to express breast milk for her nursing child for 1 year after the child's birth each time such employee has need to express the milk; and (B) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk." 29 U.S.C.A. § 207(r)(1).

Defendant argues that, even assuming that Plaintiff can prove that Defendant violated Section 207, Defendant is entitled to summary judgment on Plaintiff's FLSA claim because she cannot show that she lost wages due to an inadequate space for lactation or being denied the ability to take lactation breaks. Section 216(b) of the FLSA establishes the mechanism for private enforcement of Section 207, but it limits a plaintiff's recovery to unpaid wages and overtime. 29 U.S.C. § 216(b). Thus, a plaintiff bringing an FLSA claim under Section 207(r) may only recover "lost wages and overtime, liquidated damages, attorneys' fees, and costs that result from the employer's failure to provide an adequate space for lactation." *Tolene v. T-Mobile, USA, Inc.*, 178 F. Supp. 3d 674, 680 (N.D. Ill. 2016).

Plaintiff effectively concedes that she cannot establish such damages and that she has no remedy under Section 207(r) of the FLSA, but argues that the Court nonetheless should allow her to proceed with her claims because damages are not a requisite element of her FLSA claim.

Plaintiff does not, however, cite any case in support of this proposition. In fact, the courts that have addressed the issue have concluded that a plaintiff cannot proceed with a claim under the FLSA without alleging recoverable damages. See *Tolene*, 178 F. Supp. 3d at 680 (granting summary judgment); *Hicks v. Tuscaloosa*, 2015 WL 6123209, at *29 (N.D. Ala. Oct. 19, 2015) (same); *Salz v. Casey's Marketing Co.*, 2012 WL 2952998, at *3 (N.D. Iowa July 19, 2012) (granting motion to dismiss).

Furthermore, as Defendant notes, Plaintiff essentially is asking that the Court allow Plaintiff to proceed to trial on her FLSA claim knowing that Plaintiff will not be able to obtain any relief—a position untenable with Article III's standing requirements. See *Ewell v. Toney*, 853 F.3d 911, 917 (7th Cir. 2017) ("Without a redressable injury, [plaintiff] lacks Article III standing to press this claim." (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992)). Accordingly, the Court grants summary judgment in favor of Defendant on Plaintiff's FLSA claim.

### B.      Title VII Claims

#### i.      Exhaustion Requirement

Defendant argues that to the extent Plaintiff seeks to bring Title VII claims based on claimed harassment for taking lactation breaks, Plaintiff's claims are barred because Plaintiff failed to exhaust her administrative remedies. "Generally, a plaintiff may not bring claims under Title VII that were not originally included in the charges made to the EEOC." *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003) (citations omitted). "The purpose of the requirement of filing a charge before the EEOC is twofold. First, it serves to notify the charged party of the alleged violation. Second, it gives the EEOC an opportunity for conciliation, which effectuates Title VII's primary goal of securing voluntary compliance with its mandates*." Schnellbaecher, et al. v. Baskin Clothing Co., et al.*, 887 F.2d 124, 126 (7th Cir. 1989) (citation omitted). In order to

determine whether claims fall within the scope of earlier charges, the Court first considers "whether the allegations are like or reasonably related to those contained in the EEOC complaint." *Ezell v. Potter*, 400 F.3d 1041, 1046 (7th Cir. 2005). Second, if they are, the Court asks, "whether the current claim reasonably could have developed from the EEOC's investigation of the charges before it." *Id.* (citing *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 502 (7th Cir. 1994)). The standard for whether charges are reasonably related is "liberal." *Teal v. Potter*, 559 F.3d 687, 692 (7th Cir. 2009). Whether Plaintiff's discharge claims are within the scope of her EEOC charge is a question of law. *Conner v. Ill. Dep't of Natural Res.*, 413 F.3d 675, 680 (7th Cir. 2005).

First, the Court must consider whether Plaintiff's harassment allegations "are like or reasonably related to those contained in the EEOC complaint." *Ezell*, 400 F.3d at 1046. "[T]o be like or reasonably related to an administrative charge, the relevant claim and the administrative charge must, at minimum describe the same conduct and implicate the same individuals." *Reynolds v. Tangherlini*, 737 F.3d 1093, 1100 (7th Cir. 2013) (internal quotations omitted). In her EEOC charge, Plaintiff indicated that she sought to bring a sex discrimination claim and a retaliation claim relating to an occurrence on June 26, 2015—presumable referring to the day she resigned.[8] [20-2 (Def.'s Ex. 26), at 161.] Plaintiff's EEOC charge indicated that she believed she was constructively discharged "because of her gender (female)" and "in retaliation for opposing discrimination." [*Id.*] However, Plaintiff's EEOC charge does not include any factual details regarding any alleged harassment occurring before her discharge. The Seventh Circuit has noted that "the requirement of some specificity in a charge is not a 'mere technicality.'" *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1111 (7th Cir. 1992). Thus, the Seventh Circuit has held in

---

[8] Plaintiff resigned on June 25, 2015. [26 (Resp. Def.'s Stmt. of Facts), at ¶ 39.] Although the charge's reference to June 26, 2015 appears to be a mistake, the charge makes clear that Plaintiff is challenging her resignation as a constructive discharge.

14

connection with a racial harassment claim that "[s]ome detail, beyond a statement that 'I believe I have been discriminated against because of my race, Black' is necessary to allow the agency to perform its statutory duty." *Id*. In connection with Plaintiff's sexual harassment claims, Plaintiff's EEOC charge does not provide any more detail than that found insufficient by the Seventh Circuit in *Rush*. The fact that Plaintiff was represented by counsel when she filed her EEOC charge further supports the conclusion that Plaintiff's charge is lacking sufficient detail to raise any sexual harassment claim apart from her constructive discharge claim. *Id*. ("Any doubt we might have that racial harassment was never brought to the attention of the EEOC is resolved in this case by noting that here, [plaintiff] apparently was advised by her attorney even at the stage of filing her charge with the EEOC."). Accordingly, Defendant is granted summary judgment on Plaintiff's Title VII claims to the extent they relate to alleged sexual harassment independent from Plaintiff's alleged constructive discharge.

This conclusion is supported by the fact that Plaintiff cannot provide any explanation as to how the limited allegations in the EEOC charge describe the same conduct and implicate the same individuals as Plaintiff's sexual harassment allegations. Instead, Plaintiff argues that the same conduct and individuals were referenced during the course of the EEOC investigation. [29, at 5 ("While [Plaintiff's] Complaint and EEO Claim involved a variety of conduct and individuals, the same conduct and same individuals were repeatedly implicated and described in the slew of EEO Affidavits during the EEO Investigation.").] While Plaintiff must show that her "claim reasonably could have developed from the [EEOC's] investigation of the charges before it" in order to find that the claim sufficiently was exhausted, such a showing is not sufficient. As discussed above, this determination comes after the Court determines whether the allegations are like or reasonably

related to those contained in the EEOC complaint. Because Plaintiff fails to make such a showing, the Court need not continue with the second step of the analysis.[9]

This does not mean that Plaintiff's allegations of sexual harassment are irrelevant. Defendant has not argued that Plaintiff failed sufficiently to exhaust her constructive discharge claim. Thus, Plaintiff's Title VII claims based on her alleged constructive discharge remain. In a constructive discharge case, a plaintiff is "forced to resign because her working conditions, from the standpoint of the reasonable employee, have become unbearable." *Mosher v. Dollar Tree Stores, Inc.*, 240 F.3d 662, 667 (7th Cir. 2001) (citing *Lindale v. Tokheim Corp.,* 145 F.3d 953, 955 (7th Cir. 1998)). A constructive discharge claim can be based on either (i) discriminatory harassment or (ii) communications to the employee indicating that "the handwriting was on the wall and the axe was about to fall[.]" *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002) (internal quotation marks and citation omitted). Thus, Plaintiff may present evidence of harassment to the extent such harassment led to Plaintiff's constructive discharge.[10]

### ii. *Evidence of Discrimination and/or Retaliation*

Defendant argues that Plaintiff cannot show that Defendant acted with a discriminatory or retaliatory motive, which is a necessary requirement for her Title VII claims. Both Plaintiff and Defendant address Plaintiff's "direct" evidence of discrimination and retaliation separately from

---

[9] Plaintiff cites *Reynolds v. Tangherlini*, 737 F.3d 1093 (7th Cir. 2013), in support of the proposition that "[t]he scope of the administrative charge brought against an employer is determined by examining the claims that were 'brought to the EEOC's attention,' not by whether the EEOC actually considered or disposed of a given claim. [29, at 6.] But *Reynolds* also makes clear that "to be like or reasonably related to an administrative charge, the relevant claim and the administrative charge must, at minimum describe the same conduct and implicate the same individuals." 737 F.3d at 1100 (internal quotations omitted). Plaintiff fails to explain how the limited allegations in the administrative charge satisfy that standard with respect to her sexual harassment claims independent from her constructive discharge claim.

[10] Because Plaintiff did not exhaust her sexual harassment claims independent from her constructive discharge claim, the Court need not consider whether such claims also are barred as untimely.

Plaintiff's "indirect" evidence of discrimination and retaliation. However, the Seventh Circuit has made clear that "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The relevant question therefore is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id*.

Based on the evidence before the Court, a reasonable jury could infer that Plaintiff's internal complaints and status as a breastfeeding female caused Plaintiff to be constructively discharged.[11] Before Plaintiff returned from maternity leave, she was given "high satisfactory" ratings in all categories of her proficiency report—which was signed by Dr. Albrecht and Dr. Raza—and described as "very conscientious," "competent," and as giving "number one priority" to her patients. [32 (Resp. Pl.'s Stmt. of Facts), at ¶ 2.] Even when Plaintiff returned, she had the highest workload of all CRNA's and handled the most complex cases. [*Id*.] Plaintiff also presented evidence indicating that co-workers thought highly of her and that she maintained her performance after returning from maternity leave. [27-7 (Pl.'s Ex. F), at ¶ 4.]

Still, Plaintiff repeatedly complained that she believed she was being harassed because of her pumping. Days after Plaintiff's complaint regarding the June 9, 2015 incident, Dr. Albrecht,

---

[11] Defendant does not contest Plaintiff's claim that her status as a breastfeeding female is a protected classification. The circuit courts that have addressed the issue have concluded that breastfeeding is a medical condition related to pregnancy that is protected under the Pregnancy Discrimination Act, which amended Title VII. *E.E.O.C. v. Houston Funding II, Ltd.*, 717 F.3d 425, 428 (5th Cir. 2013)("Lactation is the physiological process of secreting milk from mammary glands and is directly caused by hormonal changes associated with pregnancy and childbirth."); *Hicks v. City of Tuscaloosa, Alabama*, 870 F.3d 1253, 1260 (11th Cir. 2017) ("Taking adverse actions based on woman's breastfeeding is prohibited by the PDA but employers are not required to give special accommodations to breastfeeding mothers."). Because Defendant has not raised this argument, Court declines to address what appears to be a matter of first impression in this circuit.

Dr. Angelov, and others appeared to be collecting information regarding the March 30, 2015 incident. Days after that, Dr. Albrecht requested that the Summary Review Board be convened to review Plaintiff's conduct. That same month, after the Summary Review Board was requested, Dr. Angelov told Plaintiff "we just want to get rid of you" and "we don't want you here anymore."

Given all of the evidence before the Court, a reasonable jury could conclude that Dr. Albrecht's initiation of the Summary Review Board—which ultimately resulted in Plaintiff's constructive discharge—was motivated by a discriminatory animus. Dr. Albrecht testified that the issue raised to the Summary Review Board was "limited to this particular episode" regarding the blue code pager, which occurred on March 30, 2015. [32 (Resp. Pl.'s Stmt. of Facts), at ¶ 22.] Dr. Albrecht also testified that Plaintiff's abandonment of the code-blue pager on March 25, 2015 "consisted grounds for a special PSB to review the dereliction" and that he approached the chief of staff who then convened one. [20-2 (Def.'s Ex. 29), at 173.]

While this explanation may seem plausible on its face, it is undermined by the fact that Dr. Albrecht waited until June 15, 2015 to request that the Summary Review Board be convened. [26 (Resp. Def.'s Stmt. of Facts), at ¶ 32.] It is further undermined by the fact that the documents for credentialing Plaintiff for re-appointment were signed by Dr. Albrecht and Dr. Raza in May of 2015. [32 (Resp. Pl.'s Stmt. of Facts), at ¶ 32.] If the incident with code-blue pager was as serious as Defendant now contends, the Court would expect that Dr. Albrecht would have requested that the Summary Review Board convene immediately after the incident, not months later.

Viewing this evidence in the light most favorable to Plaintiff, a reasonable jury could find that Dr. Albrecht's justification for requesting to convene the Summary Review Board was pretextual. See, *e.g., Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) ("The Civil Rights Act of 1964 does not require employers to have 'just cause' for sacking a worker, but

an employer who advances a fishy reason takes the risk that disbelief of the reason will support an inference that it is a pretext for discrimination." (citation omitted)); *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 290 (7th Cir. 1999) (employee's firing for "theft" because he took a few potato chips from a co-worker's open bag in the break room where the co-worker did not object to the taking, defied "any common understanding of the term" and so lacked credibility). Furthermore, the fact that Dr. Albrecht requested that the Summary Review Board convene less than a week after Plaintiff complained about the June 9, 2015 incident further supports a finding of animus. *Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) ("Close temporal proximity provides evidence of causation, and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link." (internal citations omitted)); *see also Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008) ("This court has found a month short enough to reinforce an inference of retaliation." (citing *Lang*, 361 F.3d at 419)). Plaintiff therefore has presented sufficient evidence for a reasonable jury to conclude that Dr. Albrecht acted with improper animus. Because Dr. Albrecht was not the ultimate decision-maker, however, the Court must consider whether any animus held by Dr. Albrecht can be attributed to the ultimate decision makers (*i.e.*, the members of the Summary Review Board) under a cat's paw theory.

iii. *Cat's Paw Theory*

Plaintiff argues that a jury could conclude that, even if the Summary Review Board was the ultimate decision-maker and even if the members of the Summary Review Board lacked a retaliatory motive, Dr. Albrecht's animus was imputed to the Summary Review Board by way of the cat's paw theory. That theory applies when a biased party "who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory

employment action." *Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015). "To survive summary judgment on such a theory, the plaintiff must provide 'evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action.'" *Milligan-Ramstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2017) (quoting *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013)). As discussed above, Plaintiff has identified sufficient evidence for a reasonable jury to conclude that Dr. Albrecht harbored discriminatory animus towards Plaintiff. The key question therefore is whether Plaintiff has identified sufficient evidence for a reasonable jury to find that Dr. Albrecht' action was "a causal factor of the ultimate employment action" under the traditional tort-law concept of proximate cause. *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011) (citations omitted).

An unbiased decision maker can break the casual chain. *Roberts v. Columbia Coll. Chicago*, 821 F.3d 855, 866 (7th Cir. 2016) (affirming summary judgment of discrimination claim where the decision maker conducted independent investigation of alleged plagiarism, making subordinate's alleged animus "too remote" to support liability under a cat's paw theory); *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 569 (7th Cir. 2017), reh'g and suggestion for reh'g *en banc* denied (Sept. 28, 2017) (affirming summary judgment on Title VII claims based on the cat's paw theory where plaintiff failed to show that person with animus had any input or influence over the decision maker after submitting the case to the decision maker); see also *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1253 (10th Cir. 2006) ("[W]e have held that an unbiased supervisor can break the causal chain by conducting an 'independent investigation' of the allegations against an employee."). But if the independent investigation relies on facts provided by the biased supervisor—as is necessary in any case of cat's-paw liability—then the employer

(either directly or through the ultimate decisionmaker) will have effectively delegated the factfinding portion of the investigation to the biased supervisor. *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011); see also *Miller v. Polaris Labs., LLC*, 797 F.3d 486, 490 (7th Cir. 2015) ("An employer is liable under Title VII or Section 1981 when 'a non-decision-making employee with discriminatory animus provided factual information or input that may have affected the adverse employment action.'" (quoting *Matthews v. Waukesha Cty.*, 759 F.3d 821, 829 (7th Cir. 2014))).

Plaintiff argues that because the Summary Review Board's review of Plaintiff's conduct was initiated and based on Dr. Albrecht's input, she may proceed under a cat's paw theory. The Court agrees. It was Dr. Albrecht that requested that the Summary Review Board convene to review Plaintiff's performance. [20-2 (Def.'s Ex. 19), at 122-23.] Furthermore, Dr. Albrecht was brought before the members of the Summary Review Board "to provide any additional information that may not [have been] included in the evidence file." [20-2 (Def.'s Ex. 22), at 147.] At that time, Dr. Albrecht stated that his real concern with Plaintiff's performance was the patient safety issue relating to Charge A, the only charge sustained. [*Id.* at 147, 149.]

Given Dr. Albrecht's involvement in initiating the review and providing information to the Summary Review Board, a reasonable jury could conclude that Dr. Albrecht was the proximate cause of Plaintiff's constructive termination. *Little v. Illinois Dep't of Revenue,* 369 F.3d 1007, 1015 (7th Cir. 2004) ("Even someone who merely recommends a termination is considered a decisionmaker for purposes of assessing pretext when he was the one functionally, if not formally, responsible for the decision." (citations omitted)). Defendant argues that Plaintiff cannot proceed on a cat's paw theory because Dr. Albrecht just provided the Summary Review Board with accurate information, but—in light of Dr. Albrecht's delay in requesting review of Plaintiff's conduct—it is questionable whether Dr. Albrecht's representations regarding the severity of the

21

incident with the code-blue pager actually were truthful. *Brewer v. Bd. of Trustees of the Univ. of Ill.*, 479 F.3d 908, 917 (2007) (cat's paw theory may be accepted where individual supplies "misinformation or fail[s] to provide relevant information to the person making the employment decision"); *cf. Lindsey v. Walgreen Co.*, 615 F.3d 873, 876 (7th Cir. 2010) (affirming summary judgment where supposed cat's paw manipulator did not conceal evidence from or present falsehoods to decisionmaker).

The Court recognizes that Defendant has presented evidence indicating that it was dangerous and improper for Plaintiff to leave the code-blue pager unattended. [20-2 (Def.'s Ex. 29), at 172-73, ¶ 3 (Dr. Albrecht affidavit averring that he believed a veteran could have died as a result of Plaintiff's actions on March 30, 2015 if there had been an emergency involving an airway issue, which was not uncommon).] The Seventh Circuit has cautioned district judges about second guessing legitimate employment decisions, as a court "is not a super personnel department that second-guesses employers' business judgments." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 895 (7th Cir. 2016) (citation and quotation marks omitted). Still, the more serious the nature of Plaintiff's conduct in March of 2015, the more questionable it is that Dr. Albrecht waited nearly three months to request a review of Plaintiff's conduct. A jury ultimately may find that Defendant's conduct was justified and not based on any improper motive, but Plaintiff has identified sufficient evidence to present that issue to a jury.

## IV.    Conclusion

For the reasons set forth above, Defendant's motion for summary judgment [18] is granted in part and denied in part. The case is set for further status on October 9, 2018 at 9:00 a.m.

Dated: September 25, 2018

_____
Robert M. Dow, Jr.
United States District Judge