# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| AUDRIE SAFRITHIS, ) | |
| ) | |
| Plaintiff, ) | Case No. 17-cv-2067 |
| ) | |
| v. ) | Hon. Steven C. Seeger |
| ) | |
| ROBERT WILKIE, Secretary of the ) | |
| United States Department of Veterans Affairs, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

This case involves a dispute about why Plaintiff Audrie Safrithis was forced to resign as a Certified Registered Nurse Anesthetic at a medical center run by the Defendant, the Secretary of Veteran Affairs. Safrithis claims that she was pushed out because of her status as a nursing mom who needed to pump milk at work to feed her child. Defendant, for its part, points to Safrithis's failure to carry a code-blue pager, which created a risk that veterans in surgery might not receive help in an emergency.

The dispute sounds like a quintessential question of fact best left for a jury, assuming that each side can present admissible evidence supporting its side of the story. And that's what Judge Dow concluded, too. In a thoughtful Memorandum Opinion and Order, Judge Dow carefully weighed the facts presented by the parties, surveyed the case law, and concluded that a jury needs to sort out why Safrithis was let go. *See* Dckt. No. 38.

The VA moved for reconsideration of the Court's summary judgment ruling, claiming that the opinion contained misstatements of fact. The government pins its hopes on a few

isolated sentences. The VA has a point, but only up to a point. Defendant is right about the underlying facts, but it does not change the result. Either way, this case is headed for trial.

I.

The motion for reconsideration is about when a key person learned a key fact. The basic issue is when Dr. Albrecht, the head of the anesthesiology department, learned about Safrithis's mishandling of an emergency notification device known as the code-blue pager.

The code-blue pager "is a notification device that should alarm if a patient goes into cardiac and/or respiratory arrest anywhere in the hospital." *See* Plaintiff's 56.1(a) Resp. to Defendant's Statement of Facts, at ¶ 19 (Dckt. No. 26).[1] One specific person in the anesthesiology department is responsible for the pager at all times. When the pager goes off, the person with the pager must respond "immediately," and treat the emergency like an emergency. *Id.* at ¶ 20. That representative is responsible for a critical task: "opening the arrested patient's airway." *Id.* at ¶ 19.

A code blue is announced over the intercom, too. *Id.* at ¶ 20. But others in the anesthesiology department do not need to respond. That's the responsibility of the person with the pager. *Id.* at ¶ 21. So it must be "always clear who is responsible for responding to a code blue." *Id.* at ¶ 22. When the designated person is unavailable, he or she needs to physically hand the pager to someone else. *Id.*

But Safrithis left the code-blue pager unattended.

Based on the undisputed facts, Safrithis was responsible for the code-blue pager on the afternoon of March 30, 2015. *Id.* at ¶ 23. About an hour later, she left the anesthesiology department to pump milk. *Id.* at ¶¶ 24, 26. But she didn't take the pager with her, and she didn't

---

[1] Plaintiff admitted these facts, so they are deemed to be undisputed for purposes of summary judgment.

give the pager to anyone else, either. Instead, she left the pager by itself in the residents' room. *Id.* at ¶ 26. She later explained that she expected two doctors to complete a medical procedure and return to the department in five or ten minutes. *Id.* Fortunately, no emergency took place while the pager was sitting all alone.

On her way downstairs, Safrithis ran into one of the doctors and told him that the pager was in the residents' room. He "ran to the residents' room to get there as fast as possible to pick up the pager." *Id.* at ¶ 28. He "found the pager left completely unattended on the desk." *Id.* In the meantime, Safrithis finished pumping and then went home without returning to the department. *Id.* at ¶ 30.

Given the importance of the emergency pager, one might have expected the VA to address the situation right away, and perhaps dole out some discipline. Maybe a suspension, or a stern talking-to, or a note in the personnel file. Or at least some supplemental training. But by all appearances, that did not happen. Instead, months passed, and Safrithis continued to work in the anesthesiology department. No one at the VA treated the incident like a big deal right after it happened.

Over two months later, two doctors sent emails to Dr. Albrecht, reporting the incident involving the code-blue pager. *Id.* at ¶ 31. The record does not reveal why it took so long to raise the issue with Dr. Albrecht. And it is unclear what prompted them to report Safrithis in mid-June, months after the incident. For whatever reason, the doctors reported her to Dr. Albrecht on June 12, 2015. *Id.* That's 74 days after the fact.

Three days later, Dr. Albrecht reported Safrithis to the Summary Review Board, the disciplinary group for the doctors and nurses. *Id.* at ¶ 32. The Board, in turn, collected

information, reviewed the record, and decided that Safrithis needed to go. *Id.* at ¶¶ 33–38. So she resigned.

Safrithis later filed this lawsuit. She brought discrimination and retaliation claims under Title VII. She also brought a claim under the Fair Labor Standards Act, alleging that the VA had failed to provide appropriate accommodations for her to pump milk.

The government filed for summary judgment after the close of fact discovery. Most notably, the VA argued that there was no evidence that Dr. Albrecht acted with a discriminatory purpose when he reported Safrithis to the Board.

Most of the Memorandum Opinion and Order went in the government's favor. The Court granted summary judgment to the Defendant on Safrithis's claim under the FLSA. *See* Dckt. No. 38, at 13. The Court also ruled in the VA's favor on the claims under Title VII to the extent that they related to sexual harassment independent from constructive discharge. *Id.* at 15.

But the Court ruled in Plaintiff's favor on the constructive discharge claim under Title VII. After surveying the evidence, the Court concluded that there was sufficient evidence for a reasonable jury to find that Dr. Albrecht acted with a discriminatory animus, and that he was the proximate cause for the Board's decision.

II.

Defendant responded by filing a motion for reconsideration. *See* Dckt. No. 39. That motion was a steep uphill climb. Motions for reconsideration are disfavored, and rightly so. *See Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 510 (7th Cir. 2009) ("The doctrine reflects the idea that a single court should not revisit its earlier rulings unless there is a compelling reason to do so. It is designed to further consistency, to avoid constantly revisiting rulings, and to conserve judicial resources."); *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th

Cir. 2007) ("[A] court ought not to re-visit an earlier ruling in a case absent a compelling reason, such as manifest error or a change in the law, that warrants re-examination."); *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988) ("[T]his Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure.").

District Courts have enough work on their plates, without another wave of litigation about motions that they have already decided. Motions about rulings on motions do not add much value, and slow down the wheels of progress (and justice) for everyone else. Ordinarily, a party who disagrees with a ruling by a District Court should raise that issue with the Court of Appeals, rather than trying the same argument a second time before the same judge (let alone a different one).[2]

Even so, the most important goal is getting it right. So, a District Court may take another look at its ruling in special circumstances, such as an intervening change in the law or a clear misstatement of a material fact (akin to a black-is-white mistake). *See Caisse Nationale de Credit Agricole v. CBI Indus. Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) ("Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence.").

After the reassignment of this case, the Court held an initial status hearing and expressed skepticism about motions for reconsideration. *See* Dckt. No. 50. But at the government's request, the Court took a fresh look at the Memorandum Opinion and Order, based on the government's promise that it involved a black-is-white level of mistake. As promised, the Court

---

[2] Motions for reconsideration are especially disfavored when a litigant retries the same argument in front of a different judge. *See Aparicio-Brito v. Lynch*, 824 F.3d 674, 688 (7th Cir. 2016); *HK Sys. v. Eaton Corp.*, 553 F.3d 1086, 1089 (7th Cir. 2009). Here, Defendant filed a motion for reconsideration before Judge Dow, but that motion was pending at the time of reassignment.

read the summary judgment briefs and related materials, and took a careful second look at his predecessor's ruling.

In its motion for reconsideration, the government takes issue with four sentences in Judge Dow's thorough opinion. The sentences have to do with when Dr. Albrecht first learned of the pager incident.

Dr. Albrecht is a critical player in the story. The Supervisory Review Board made the decision to terminate Safrithis, but none of the Board members knew her. There is no evidence that the Board members knew about any issues involving her pumping, let alone any evidence that they had a retaliatory motive. Even so, the Board's decision can give rise to a claim under the "cat's paw" theory if a subordinate had a discriminatory animus and proximately caused the Board's decision. *See Milligan-Grimstad v. Stanley,* 877 F.3d 705, 711 (7th Cir. 2017). Here, Dr. Albrecht brought the pager incident to the Board's attention, so the reason for his action is one of the keys to the case. Plaintiff must show that he had a discriminatory motive, or else she has no claim.

The VA takes aim at four sentences in the opinion that allude to when Dr. Albrecht first learned that Safrithis had abandoned the pager. The sentences suggest that Dr. Albrecht knew about the pager incident when it happened (in March 2015), but waited to do anything about it until months later (in June 2015). Specifically, the opinion included the following lines:

- "While this explanation [*i.e.,* that Dr. Albrecht referred her to the Board because of the pager incident] may seem plausible on its face, it is undermined by the fact that Dr. Albrecht *waited* until June 15, 2015 to request that the Summary Review Board be convened." Dckt. No. 38, at 18 (emphasis added).

- "If the incident with the code-blue pager was as serious as Defendant now contends, the Court would expect that Dr. Albrecht would have requested that the Summary Review Board convene *immediately* after the incident, not months later." *Id.* (emphasis added).

6

- "Defendant argues that Plaintiff cannot proceed on a cat's paw theory because Dr. Albrecht just provided the Summary Review Board with accurate information, but – in light of Dr. Albrecht's *delay* in requesting review of Plaintiff's conduct – it is questionable whether Dr. Albrecht's representations regarding the severity of the incident with the code-blue pager actually were truthful." *Id.* at 21–22 (emphasis added).

- "Still, the more serious the nature of Plaintiff's conduct in March of 2015, the more questionable it is that Dr. Albrecht *waited* nearly three months to request a review of Plaintiff's conduct." *Id.* at 22 (emphasis added).

It is fair to say that the timing of Dr. Albrecht's knowledge played an important role in the Court's ruling. After all, the Court drew attention to the delay several times, which illustrated its importance. The sentences were not throw-away lines in the background section of the opinion, either. They appeared in the section finding that there was sufficient evidence for a reasonable jury to find discriminatory animus and proximate causation.

The government argues that there was no evidence in the record that Dr. Albrecht knew about the incident involving the code-blue pager when it took place. In fact, according to the VA, the undisputed evidence demonstrates that Dr. Albrecht didn't learn about the infraction until June 2015, the same month that he reported Safrithis to the Summary Review Board. The government cites a declaration from Dr. Albrecht saying that he "first learned" of the pager incident "sometime in June, 2015." *See* Dckt. No. 32-2, at 26. And Plaintiff submitted no contrary evidence.

So, the evidence on this issue is one-sided. Dr. Albrecht didn't sit on his hands – he didn't "wait[]" to raise the issue, and there was no "delay." *See* Dckt. No. 38, at 18. Instead, he did the opposite. He elevated the issue right after he learned about it. And the prompt action, the government argues, is inconsistent with a discriminatory animus. Delay can't support a finding of discrimination when there was no delay.

7

In response, Safrithis concedes that there is no evidence that Dr. Albrecht knew about the pager incident when it happened. In fact, Plaintiff disavows any theory that Dr. Albrecht sat on his hands. "Plaintiff neither alleged, nor meant to allege, that Dr. Albrecht knew about the pager for months before taking action." Dckt. No. 43, at 2. During a hearing on the motion for reconsideration, Plaintiff's counsel acknowledged that, for purposes of summary judgment, there is no evidence that Dr. Albrecht knew about the code-blue pager incident until June 2015:

> The Court: At the summary judgment stage, did you submit any evidence of any kind that Dr. Albrecht knew about the incident before June of 2015?
>
> Counsel: I don't believe we did.

*See* 11/12/19 Tr., at 6; *see also id.* at 7 ("yes, that's an undisputed fact") (putting credibility issues aside); Dckt. No. 51.

### III.

But does it matter? Safrithis has an obligation to prove pretext – that is, that she was let go for a discriminatory reason, not a legitimate reason. *See Texas Dep't of Cmty Affairs v. Burdine*, 250 U.S. 248, 253 (1981). But she doesn't have to prove delay. Evidence of delay can help build a case, but it isn't required, either. The government concedes, as it must, that delay is not an essential component of a constructive discharge claim. *See* 11/12/19 Tr., at 8. A plaintiff can bring a claim when she is fired for a new bogus reason, or an old bogus reason.

Simply put, it is possible for a jury to find that Safrithis was let go for a discriminatory reason, even if Dr. Albrecht acted promptly when he learned about the pager incident. The question then becomes whether there is *other* evidence in the record to support a finding of pretext. At this stage of the case, the Court must view the evidence in favor of Safrithis, the non-movant. *See Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016). As Judge Dow's opinion amply

8

explained, the record includes other evidence that could support a finding by a reasonable jury that Dr. Albrecht acted with a discriminatory animus.

Consider, for example, an episode that took place when she was expecting. Safrithis had a high-risk pregnancy, and she asked to work offsite less frequently. *See* Dckt. No. 32, at ¶ 1. But Dr. Albrecht denied her request, adding (insult to injury) that she needed to "be able to do everything like everybody else." *Id.*

Safrithis, mind you, was not an under-achiever. Before returning from maternity leave, she received a "high satisfactory" rating. *Id.* at ¶ 2. After returning, she had the highest workload of any certified nurse in the department, and she handled the most complex cases. *Id.* A reasonable jury could view the disparaging comment as evidence of hostility to issues relating to pregnancy. And it is only a short step to extend that inference to issues relating to post-pregnancy, such as pumping for a newborn.

Another incident took place a few months after she returned from maternity leave. On March 24, 2015, a week before the pager incident, Safrithis wrote a letter to Dr. Albrecht complaining that she was harassed by another doctor (but not by Dr. Albrecht) about her pumping. *See* Dckt. No. 26, at ¶¶ 10–12; Dckt. No. 20-2, at 77. The letter included specific examples, including disparaging comments by the doctor that she was "doing nothing for the past hour" when she was pumping. Dckt. No. 20-2, at 77.[3] Safrithis complained that there was an "uncomfortable and hostile work environment" that made it difficult to "pump breast milk for my child." *Id.*

---

[3] The government points out that the doctor in question (Dr. Gretchen Fox) was *herself* pumping when she allegedly harassed Safrithis. *See* Dckt. No. 32, at ¶ 10. A jury might find it implausible that a nursing mom was hostile to another nursing mom because of her pumping. But that's up to the jury.

9

In response, Dr. Albrecht met individually with Safrithis and the doctor in question. *See* Dckt. No. 26, at ¶ 13. Dr. Albrecht then attempted to schedule a meeting with the nurses and doctors in the anesthesiology department to "improve communication and bolster relationships." Dckt. No. 26, at ¶ 14.[4] But the meeting was scheduled on Safrithis's day off, and Dr. Albrecht told her that she could not bring her infant son to the meeting. *See* Dckt. No. 32, at ¶ 18.

So the meeting went forward without her. And nothing changed. *See* Dckt. No. 32, at ¶ 9; Dckt. No. 20-2, at 28 (Safrithis Dep., at 89:2–4).

As Judge Dow concluded, a reasonable jury could find that Dr. Albrecht did not take her allegations of harassment seriously. He took little or no concrete action, and scheduled a meeting when she could not attend. *See* Dckt. No. 38, at 4 n.3. That's exactly what Safrithis said in her interrogatory answers: "Instead of taking Plaintiff's complaints seriously, Dr. Albrecht dismissed Plaintiff's complaints of harassment as mere perception." *See* Dckt. No. 20-2, at 106 (Ex. 18); *see also* Affidavit of Audrey Safrithis, Dckt. No. 27-2, at 4 ("His response was to challenge what I was saying. He stated maybe all of this was just my perception. I felt completely dismissed by him and his comments."). A reasonable jury could conclude that Dr. Albrecht turned a deaf ear and gave her the cold shoulder.

Months later, there was more friction about her pumping. In May 2015, Dr. Albrecht sent an email to Safrithis and the rest of the anesthesiology department, telling everyone that they needed to carry their work phones when on the job. *See* Dckt. No. 26, at ¶ 15; *see also* Dckt. No. 32, at ¶ 19. A week or two later, Safrithis told Dr. Albrecht and others that she would not bring her work phone with her when pumping because it created stress and prevented her from

---

[4] As Judge Dow noted, it is unclear from the record whether this meeting was designed to address her complaint about pumping-related issues. Safrithis's affidavit suggests that the meeting was meant to address it. *See* Dckt. No. 27-2, at 4.

expressing milk. *See* Dckt. No. 32, at ¶ 19. Dr. Albrecht agreed to accommodate her, saying that she did not need to answer the phone while on an approved break. *Id.*

But several doctors contacted her anyway. On May 19, 2019, two doctors called her on her work phone, but couldn't reach her because she had left her phone in her office while pumping. *See* Dckt. No. 26, at ¶ 16. The next day, Dr. Albrecht told her by email that she needed to carry her work phone while on duty. *Id.*; *see also* Dckt. No. 20-2, at 90 (Ex. 14). Safrithis responded that she would not take her work phone with her while pumping. *See* Dckt. No. 26, at ¶ 16.

Another conflict took place a few weeks later. On June 9, 2019, Safrithis pumped once again without taking her work phone. *Id.* at ¶ 17. One of the doctors knew that she was pumping, but nine minutes later, he called her on her work phone anyway. *Id.*; Dckt. No. 32, at ¶ 20. When he couldn't reach her, the doctor texted Safrithis on her personal phone. *See* Dckt. No. 26, at ¶ 17; Dckt. No. 32, at ¶ 20. That text created stress, and she had a hard time expressing milk. *See* Dckt. No. 32, at ¶ 20.[5]

Safrithis reported the incident to Dr. Albrecht: "I should not be harassed while I pump." *See* Dckt. No. 20-2, at 92 (Ex. 15). She reiterated that she would not take her work phone with her while she pumped. *Id.* In response, Dr. Albrecht reminded her of the policy and instructed her to carry her work phone with her while on duty, including when pumping. *Id.*; *see also* Dckt. No. 26, at ¶ 18. He promised that he would investigate the incident and "try to come to a resolution that is satisfactory to all." *See* Dckt. No. 20-2, at 92 (Ex. 15). He also reiterated – twice – that she did "not need to answer the phone" while on approved breaks. *Id.*

---

[5] The Court assumes that the texting incident described in paragraph 17 of Plaintiff's 56.1(a)(3) Response (Dckt. No. 26) is the same texting incident described in paragraph 20 of Defendant's Response (Dckt. No. 32). That is, the Court assumes that a doctor texted her while pumping on one occasion, not two. But it makes no difference. If the incident happened twice, Safrithis would have even more evidence, not less.

11

A jury might conclude that Dr. Albrecht's reaction was somewhat one-sided. He reminded Safrithis of the policy about taking her work phone. But there is no evidence in the record that Dr. Albrecht reminded the other doctors that she was entitled to pump. He took no apparent action to ensure that she could pump in peace.

Three days later, two doctors sent almost-simultaneous emails to Dr. Albrecht, reporting Safrithis for the code-blue pager incident in March. It is unclear what prompted two doctors to report the same incident at the same time. The emails were sent within minutes of each other – one doctor sent his email at 11:48 a.m., and the other sent her email at 11:44 a.m. *See* Dckt. No. 26, at ¶ 31; *see also* Dckt. No. 20-2, at 95, 97 (Exs. 16 & 17). The emails read as if there was a prior conversation, too. One email begins "Here it is," and the other begins "[t]he following is what I recall from that day." *Id.* The conspicuous phraseology – "Here *it* is" and "*that* day" – suggests that there was a common understanding of the topic before the emails were sent.

Maybe there was a good reason for two doctors to report the same incident at the same time on the same day to the same person. Or maybe the fix was in. One possible inference from near-simultaneous emails to Dr. Albrecht about a months-old incident is that there was a concerted effort to build a case to get rid of her.

And get rid of her when? Right after she complained about harassment about pumping. That may not be the only inference, and it might not be the strongest one, either. But it is within the realm of decision-making by a reasonable group of people. The jury can take conspicuous timing into account, and here, it adds to the mix of evidence supporting Plaintiff's story. *See Good v. Univ. of Chicago Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012); *Lang v. Illinois Dept. of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004).

The government argues that suspicious timing does not suffice when there was a significant intervening event. *See* Dckt. No. 52, at 6. According to the VA, Dr. Albrecht learned about the pager incident and promptly reported it, which "destroys any reasonable inference" that she was let go because of her pumping. *Id.* at 6–7.

But the government's evidence on timing is not so crystal clear. Defendant did not present evidence about when, exactly, Dr. Albrecht learned about the pager incident. The most that it can say is that he learned about it "sometime in June, 2015." *See* Dckt. No. 32-2, at 26. Maybe the timing was the other way around. Maybe Dr. Albrecht learned about the pager incident in early June, and then learned about the June 9 pumping incident, and *then* reported her to the Board.

In any event, the precise timing does not matter. Even under the VA's version of events, Dr. Albrecht learned about the pager problem and the June 9 pumping incident within the same week or so. Each side will point to proximity in time to support its side of the story. And the jury will get to decide which story to believe.

Safrithis also presented evidence that the pager incident was blown out of proportion. At least two doctors knew in March that she had abandoned the pager, but they apparently didn't think that it was serious enough to warrant immediate action. *See* Dckt. No. 26, at ¶ 31; Dckt. No. 32, at ¶ 15. She cites evidence that others had abandoned the pager, too. *See* Dckt. No. 32, at ¶ 17. And oftentimes, the pager didn't even work. *Id.* at ¶ 25. The pager wasn't even part of her job responsibilities, *id.* at ¶ 24, and if that's true, one wonders why she lost her job.

Viewed as a whole, the evidence could support a finding that the pager incident wasn't the real reason for reporting her. Safrithis may have a hard time convincing a jury that leaving

13

an emergency pager unattended is no big deal. But at this stage of the case, the important point is that there is evidence on her side of the ledger.

The record includes facts that favor the government's case, too. And the jury at trial – unlike the Court at summary judgment – will not be required to view the evidence in the light most favorable to Safrithis. But the question is whether there is enough evidence to get to the jury in the first place. There is.

True, Plaintiff's case would have been stronger if Dr. Albrecht had sat on his hands and raised an incident that he had known about for months. The lack of intentional delay does let some of the air out of the balloon. But there is still enough there to get to a jury.

Date:   February 7, 2020

　　　　　　　　　　　　　　　　　　　　Steven C. Seeger
　　　　　　　　　　　　　　　　　　　　United States District Judge